**2015 BNH 003**     Note:   This is an unreported opinion.  Refer to LBR 1050-1 regarding citation.
_____

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW HAMPSHIRE

In re:                                                                                           Bk. No. 08-13522-JMD
                                                                                                 Chapter 7
Timothy J. Bates and
Cathy N. Bates,
        Debtors


Timothy J. Bates and
Cathy N. Bates,
        Plaintiffs,

v.                                                                                               Adv. No. 13-1043-JMD

CitiMortgage, Inc. s/b/m to
ABN AMRO Mortgage Group, Inc., and
Federal Home Loan Mortgage Corp.,
        Defendants

*Terrie Harman, Esq.*
*Kristina Cerniauskaite, Esq.*
*Harman Law Offices*
*Portsmouth, New Hampshire*
*Attorneys for Debtors/Plaintiffs*

*Gregory N. Blase, Esq.*
*David D. Christensen, Esq.*
*K&L Gates LLP*
*Boston, Massachusetts*
*Attorneys for Defendant CitiMortgage, Inc. s/b/m to*
*ABN AMRO Mortgage Group, Inc.*

## <u>MEMORANDUM OPINION</u>

### I.  INTRODUCTION

      Timothy J. and Cathy N. Bates (the "Plaintiffs" or "Debtors") filed a complaint (Doc. No.

12) (the "Complaint") against CitiMortgage, Inc. s/b/m to ABN AMRO Mortgage Group, Inc.

("Citi") and Federal Home Loan Mortgage Corporation ("Freddie Mac") (collectively the "Defendants") contending they violated the discharge injunction of 11 U.S.C. § 524(a). The Plaintiffs seek to hold the Defendants in contempt pursuant to 11 U.S.C. § 105(a) and collect damages. The Court previously granted summary judgment in favor of the Defendants with respect to Counts I through V and in favor of the Plaintiffs as to liability with respect to Count VI (Doc. No. 73). The Court held a trial on February 18, 2015, on the issue of damages. The Court took the matter under advisement (Doc. No. 110) and gave the parties time to file written closing arguments, which they did (Doc. Nos. 118, 119, and 120).

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and Local Rule 77.4(a) of the United States District Court for the District of New Hampshire. This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II. FACTS

The Plaintiffs filed a chapter 7 bankruptcy petition on November 26, 2008 (Doc. No. 1). At the time the Debtors filed bankruptcy, they resided at 94 Bascom Road in Newport, New Hampshire. The Debtors' residence served as security for a loan held by Citi. The Debtors did not reaffirm their mortgage debt with Citi while in bankruptcy. On February 3, 2009, Citi was granted relief from the automatic stay (Doc. No. 14). On April 2, 2009, the Debtors received a discharge (Doc. No. 19) (the "Discharge Order"). Notice of the Discharge Order was sent to Citi on April 4, 2009 (Doc. No. 20). On May 13, 2009, the Debtors' case was closed (Doc. No. 21).

After the Debtors' bankruptcy case was closed, the Debtors received a notice of foreclosure. Subsequently, the Debtors executed a loan modification with Citi. The loan modification contained a separate rider that specifically provided that the loan modification

2

agreement did not affect the bankruptcy discharge of the Debtors' personal liability on the debt to Citi.  The Debtors made payments pursuant to the terms of the loan modification agreement until sometime in 2010.  After payments stopped, Citi recommenced foreclosure proceedings and, on April 25, 2011, the Debtors' home was foreclosed.  The Debtors moved out of their residence sometime in October of 2011.  In January of 2012, the Debtors each received an IRS Form 1099-A from Freddie Mac; the form indicated that certain information relating to Citi's foreclosure and acquisition of the Debtors' property would be reported to the Internal Revenue Service.

      On May 14, 2013, the Debtors filed a motion seeking to reopen their bankruptcy case so they could file a complaint seeking damages for the Defendants' alleged violations of the Discharge Order in connection with their activities related to Citi's mortgage and Freddie Mac's issuance of the Form 1099-A (Doc. No. 24).  The Debtors filed their complaint on May 15, 2013.

      Shortly thereafter, during the evening of June 11, 2013, Mr. Bates answered the telephone at their new home (which had the same phone number as the one when they resided at 94 Bascom Road) and heard an automated message from Citi stating:

> According to our records we have been unable to obtain current insurance information.  This information is required based on the terms of your mortgage agreement.  Please provide your insurance carrier and policy information to us.

Mr. Bates testified that he listened to the recorded message multiple times.  When he hung up, he relayed the substance of the message to his wife.

      Contrary to the impression left by the summary judgment record, Mr. Bates acknowledged at trial that there was no back and forth discussion with any Citi representative during the course of the phone call.  Citi did not demand that the Debtors go out and buy

3

insurance if they did not already have it; however, Mr. Bates interpreted the phone call to mean that the Debtors were required to show that they had insurance on their former home.

Both Debtors testified that the automated phone call from Citi upset them. They did not understand why Citi would be contacting them, more than two years after their home had been foreclosed. The phone call dredged up old feelings that they had experienced when their home was foreclosed and after they had received the Form 1099-A. The Debtors felted harassed and bullied. Mr. Bates testified that he felt the phone call was made in retaliation for the Debtors not being able to pay off their mortgage. Both Debtors testified that they believed Citi was going to continue coming after them. It seemed that they would never be able to move on.

The Debtors described feeling generally stressed after the phone call. The couple resumed drinking and arguing again. Mrs. Bates got angry, would shake, and experienced episodes of diarrhea. Despite such issues, she did not see a doctor after the phone call and testified inconsistently upon cross-examination that she did not have any health problems after the phone call. After being contacted by Citi in June of 2013, Mrs. Bates again asked for a divorce as "it would be easier just to walk away from everything." Mr. Bates testified that he was concerned that his heart issues were returning but his doctor confirmed that he was okay. Mr. Bates indicated his pride was hurt, he felt depressed, and he did not socialize as much.

After the phone call Mr. Bates and the couple's son returned to therapy, which they had begun around the time their home had been foreclosed in 2011, as the couple's stress caused problems with their son. Mrs. Bates testified that she did not return to therapy. Mr. Bates testified that they had co-payments for these sessions that their insurance did not cover, but he did not know how much they totaled. The Plaintiffs presented no corroborating medical

4

evidence and no documentary evidence that would show the amount of any medical expenses they incurred as a result of the June 2013 phone call.

Before the phone call, back in 2011, the Debtors had hired Attorney Terrie Harman to represent them in dealing with Citi prior to the Debtors' vacating their residence. Attorney Harman continued to represent the Debtors and filed suit against the Defendants on May 15, 2013, for alleged violations of the discharge injunction. Attorney Harman's firm performed 327.39 hours of services between September 21, 2011, through February 18, 2015, the date of trial, with fees totaling $72,502.16 and expenses totaling $502.57.

### III.  DISCUSSION

The Court previously found that Citi violated the discharge injunction contained in 11 U.S.C. § 524(a)(2) when it contacted the Plaintiffs requesting proof of insurance on the Debtors' former residence on June 11, 2013, at which time (1) the Debtors' personal liability associated with their home had been discharged, the Discharge Order having entered on April 2, 2009, and (2) the in rem liability associated with the Debtors' mortgage had been extinguished, the property having been foreclosed in April of 2011. In the Complaint, the Plaintiffs state that "CitiMortgage should be held in contempt for violating the discharge injunction and sanctioned pursuant to 11 U.S.C. § 105(a) by an award of actual damages, including damages for emotional distress, as well as attorney's fees and costs in favor of the Plaintiffs." Complaint ¶ 74.

Section 524 of the Bankruptcy Code does not contain a specific remedies provision. United States v. Rivera Torres (In re Rivera Torres), 309 B.R. 643, 647 (B.A.P. 1st Cir. 2004), rev'd on other grounds, 432 F.3d 20 (1st Cir. 2005). The First Circuit Court of Appeals has ruled that "a bankruptcy court is authorized to invoke § 105 to enforce the discharge injunction

5

imposed by § 524 and order damages . . . if the merits so require." Bessette v. Avco Fin. Servs., Inc., 230 F.3d 439, 445 (1st Cir. 2000); see also Canning v. Beneficial Maine, Inc., 706 F.3d 64, 69 (1st Cir. 2013); Pratt v. Gen. Motors Acceptance Corp. (In re Pratt), 462 F.3d 14, 17 (1st Cir. 2006); Duby v. United States (In re Duby), 451 B.R. 664, 670 (B.A.P. 1st Cir. 2011); Lumb v. Cimenian (In re Lumb), 401 B.R. 1, 6 (B.A.P. 1st Cir. 2009). The First Circuit has further explained that bankruptcy courts may use their "statutory contempt power to order monetary relief, in the form of actual damages, attorney fees, and punitive damages, when creditors have engaged in conduct that violates § 524." Bessette, 230 F.3d at 445; see Pratt, 462 F.3d at 20 (concluding that the creditor wilfully violated the discharge injunction and thus the debtors were entitled to establish and recover their "compensatory damages" together with "other appropriate relief" under § 105(a)). The First Circuit Bankruptcy Appellate Panel (the "BAP") has concluded that bankruptcy judges in the First Circuit are permitted to award damages for emotional distress attributable to a violation of the discharge injunction. Rivera Torres, 309 B.R. at 650. "Often . . . a debtor's out-of-pocket expenses and other economic losses will be relatively insignificant with respect to a violation of the discharge injunction. In such instances redress for sustained emotional injury would be a major factor in fashioning an award of full remedial relief." Id. at 649. "[M]onetary damages for emotional injury would be appropriate only if the nature and extent of the injury and its reasonable relationship to the violation of the discharge injunction are established by competent evidence. . . . Such a showing may or may not require corroborating medical evidence." Id.

       In this case, the Court must determine what damages, if any, the Plaintiffs may recover due to their receipt of a single, prerecorded telephone call from Citi in June of 2013. The Plaintiffs did not present evidence that would establish any out-of-pocket costs arising directly

from the phone call and therefore they may not recover the same. Instead, the Plaintiffs seek to recover damages for emotional distress, the attorney's fees and costs they incurred in pursuing their discharge violation claim against Citi, and a monetary sanction.

### A. Emotional Distress Damages

At trial, the Plaintiffs testified at length about the emotional distress they suffered around the time their home was foreclosed in 2011 and before the phone call was received in June of 2013. It is clear that the Debtors were devastated by the foreclosure of their family home, a house they had lived in for more than twenty years and in which they raised their two sons. They were also upset that in 2012 Freddie Mac sent them an IRS form, which they claim stated they were still liable for the mortgage debt. It was against this backdrop that the Debtors received the phone call in 2013.

The evidence is clear that the Debtors were experiencing emotional and family problems before the June 2013 phone call. Mr. Bates testified that his drinking had picked up prior to the phone call, Mrs. Bates testified that their family life was always in a constant state of turmoil, and both parties testified that their son had started to experience problems before the phone call.

To establish a claim for emotional damages, the Debtors must show that the problems they experienced after June 2013 were brought about, or made worse, by Mr. Bates' receipt of Citi's automated telephone message. Rivera Torres, 309 B.R. at 649 (explaining that "monetary damages for emotional injury would be appropriate <u>only if</u> the nature and extent of the injury and <u>its reasonable relationship</u> to the violation of the discharge injunction are established by competent evidence") (emphasis added).

The emotional distress described by the Debtors in this case mirrors that described in Rivera Torres:

7

>Antonio testified that he had made four or five trips from his new home in Florida to Puerto Rico to try to resolve the problem with the IRS. He also said that he had experienced an upset stomach, nervousness and stress, and that the situation had adversely affected his marriage.
>
>Sofia did not testify at the hearing, but her deposition transcript was admitted into evidence by agreement of the parties and is included in the record on appeal. It shows that Sofia had made telephone calls to the IRS each time she and her husband had received a collection letter. She testified that the threat to garnish her husband's wages and the request of the IRS that they describe all of their belongings had caused her to feel worry and panic. The collection activity also had caused marital problems and times when the couple had not spoken to each other for days. Sophia also said that she had suffered anxiety and stress-related neck pains, muscle spasms, and sleep problems and that she had taken medication to help her sleep. There is no evidence that either Debtor had consulted a doctor and no corroborating medical evidence was offered.
>
>. . .
>
>Antonio testified that the communications from the IRS made him nervous and unable to concentrate, caused him an upset stomach, and caused him and his wife to argue about their debt to the IRS, and his wife would get so upset that they would not talk for days. Sofia testified in her deposition that the stress caused by the IRS's communications manifested itself in neck pain, lack of sleep, and muscle spasms.

Id. at 651. The BAP concluded that the bankruptcy court did not abuse its discretion when it awarded emotional distress damages in the amount of $5,000.00 to each debtor for a total of $10,000.00. Id. On appeal, the First Circuit expressed skepticism that the debtors had met the standard for emotional distress damages. Rivera Torres, 432 F.3d at 23 n.2 ("We will assume, with some skepticism, that the debtors have met the standard for emotional distress damages.") (emphasis added). However, the First Circuit did not rule on this issue but instead reversed the award of emotional damages against the United States on sovereign immunity grounds.

Having considered the standard outlined by the BAP and the comments of the First Circuit, the Court finds that the Debtors have not demonstrated with competent evidence a reasonable relationship between Citi's violation of the discharge injunction (i.e., making an

8

automated call requesting proof of insurance on their foreclosed residence) and any emotional distress experienced by the Debtors.  The record is clear that the Debtors had issues with their son both before and after the phone call; the Debtors did not establish that any problems after June 2013 were directly attributable to the phone call.  The record is also clear that the Debtors drank both before and after the phone call; the Debtors did not establish that any drinking after June 2013 was directly attributable to the phone call.  Further, while Mrs. Bates renewed her request for a divorce after the phone call, she had asked for a divorce before the phone call; the evidence at trial did not establish that her second request for a divorce was directly attributable to the phone call.  Mrs. Bates described various physical problems that occurred both before and after the phone call; however, she testified that these problems were not so severe that she went to see her doctor.  Mr. Bates also described concerns that his heart issues were returning after the phone call; however, he testified that his doctor told him he was doing okay.

      Overall, the Debtors testified that they were experiencing difficulties on many fronts, but the evidence did not establish that the difficulties they described were caused by the June 2013 phone call rather than from the foreclosure and receipt of the tax forms, which the Court previously found did not violate the Discharge Order, or from the normal stress of daily living and being married and raising children.  While the phone call may have aggravated their already fragile state, and caused them to feel harassed by Citi, the record does not demonstrate that the phone call did so in any direct or quantifiable way.  Accordingly, the Court is unable to find a basis for awarding emotional distress damages.

      **B.  Attorney's Fees and Expenses**

      Attorney's fees and expenses are available as compensatory damages under § 105(a) for violation of the discharge injunction and are analyzed under the same standard as attorney's fees

that are awarded as damages under 11 U.S.C. § 362(k) for violation of the automatic stay. Duby, 451 B.R. at 674. To calculate fee awards bankruptcy courts use the lodestar approach. Berliner v. Pappalardo (In re Sullivan), 674 F.3d 65, 69 (1st Cir. 2012); see Rifken v. CapitalSource Fin., LLC (In re Felt Mfg. Co., Inc.), 402 B.R. 502, 523 (Bankr. D.N.H. 2009); In re Porter, 399 B.R. 113, 117 (Bankr. D.N.H. 2008). The lodestar method involves multiplying the number of hours productively spent by the attorney (excluding hours that are excessive, redundant, or otherwise unnecessary or spent on overworked tasks) by a reasonable hourly rate (which is benchmarked to the prevailing rates in the community for lawyers with like qualifications, experience, and competence). Joyce v. Town of Dennis, 720 F.3d 12, 27 (1st Cir. 2013); Sullivan, 674 F.3d at 69; Torres-Rivera v. O'Neill-Cancel, 524 F.3d 331, 336 (1st Cir. 2008); Lipsett v. Blanco, 975 F.2d 934, 937 (1st Cir. 1992); Wilson v. Port City Air, Inc., Civil No. 13-cv-129-LM, 2014 WL 7333016, at *2 (D.N.H. Dec. 19, 2014); Porter, 399 B.R. at 117. Courts "may adjust the lodestar itself, upwards or downwards, based on any of several different factors, including the results obtained and the time and labor actually required for the efficacious handling of the matter." Torres-Rivera, 524 F.3d at 336; see Lipsett, 975 F.2d at 937. Courts may also disallow time spent in litigating failed claims, subject to principles of interconnectedness and interrelatedness. Torres-Rivera, 524 F.3d at 336; Lipsett, 975 F.2d at 940-41. Reasonableness in the context of awarding fees is largely a matter of a court's informed judgment. Torres-Rivera, 524 F.3d at 336. The First Circuit has further explained that "[a] bankruptcy court's explanation of its fee award need not proceed line by line through the fee application. . . . There is no requirement that a bankruptcy court, in explaining a fee award, be precise to the point of pedantry. Instead, the explanation need only be sufficiently detailed to allow a reviewing court to ascertain the trial

court's thought processes and glean the basis for its award." Sullivan, 674 F.3d at 70-71 (citations omitted).

At trial, the Debtors presented a copy of their lawyers' billing records, which show that between September 21, 2011, and February 18, 2015, their lawyers provided 327.39 hours of services at a total cost of $72,502.16, at an average rate of $221.45 per hour. While the billing records include a description of services that generally detail the tasks that were performed and the length of time spent on each task, the billing records omit key information, including the identify of each person rendering services and whether they were an attorney, paralegal, or legal assistant, the billing rate for each person providing services, the amount charged for each task detailed in the billing records, the total amount of time spent by each person providing services, and the total compensation sought by each person providing the services. See LBR 2016-1(c)(2)(C) (outlining the items that should be included in a fee application filed in this district). "Where [a] party furnishes time records that are ill-suited for evaluative purposes, the court is hampered in ascertaining whether those hours were excessive, redundant, or spent on irrelevant issues. In such a circumstance, the court may adjust those entries to achieve an equitable result." Torres-Rivera, 524 F.3d at 340 (citation omitted).

Attorney Harman testified at trial that twelve employees from her office worked on the Debtors' case. Although not provided in the written billing records submitted into evidence, at trial, she outlined the rates charged by each employee. Attorney Harman was the lead attorney on the case and charged $295.00 per hour when the litigation began and increased her rate to $325.00 per hour as of August 1, 2014.

Citi does not challenge the rates billed by the employees in Attorney Harman's office, and the Court finds that the rates are comparable to those charged by other law firms in this

district with like qualifications, experience, and competence. Instead, Citi contends that the fees requested are excessive, noting in particular that the fees requested include eighteen months of services prior to the June 2013 phone call, which are unrelated to Count VI of the Complaint concerning the phone call. Further, Citi points out that the billing records after June 2013 do not make clear whether time was spent pursuing the Debtors' claim concerning the phone call or the Debtors' other unsuccessful claims. Attorney Harman admitted at trial that other than the four billing entries that expressly mention the phone call, there was no way for her (and thus the Court) to determine what time was spent pursuing the Debtors' claim under Count VI of the Complaint.

In addition, Citi argues that the time spent after the June 2013 call is far in excess of what should have been reasonably spent given the complexity of the case and the fact that the Plaintiffs did not suffer any significant damage as a result of the phone call. Citi points to the fact that Attorney Harman exercised little or no control over the amount of time spent on tasks and the number of timekeepers that were allowed to work on the case.

The Court agrees with Citi. The time counsel spent litigating prior to the June 2013 phone call are not recoverable as damages related to Citi's violation of the discharge injunction, outlined in Count VI of the Complaint, with one exception: Count VI was added to an existing complaint and therefore it would be reasonable to include some time for the drafting of the initial complaint. Overall, upon review of the billing records, the Court estimates that the services performed prior to June 11, 2013, total approximately 70 hours and should not be included in any damage calculation.

The Court notes further that the time spent between June 17, 2013, when the Debtors first contacted Attorney Harman about the phone call, and September 23, 2014, when the Court

issued its order granting the Plaintiffs' motion for summary judgment with respect to Count VI, was spent on all six counts of the Complaint. Attorney Harman admitted that it would be impossible to determine how much of the time spent during this period, which the Court estimates totals 180 hours, was spent solely on issues related to the Debtors' one successful claim. There are other issues, however, with respect to this time.

First, the Court finds that allowing twelve timekeepers to work on the case inevitably led to duplication of work and loss of efficiencies. For example, the Court can find several entries in the billing records that reflect time was spent getting employees up to speed on the case. On June 20, 2014, there is an entry for "Review MB's transfer memo on status of case." On July 1, 2014, .5 hours was spent on "Conference with Vicki re: distinction between what was done on November 8, 2013 as to the Bates' Affidavits and what was done June 11, 2014 as to their Affidavits." On August, 25, 2014, a staff member spent .5 hours on "Draft[ing] transition memo to MB." On December 22, 2014, .7 hours was spent on "Conference with TH - intro to case; discussed work to be done." Further, the Court can find several examples where office conferences were attended by multiple staff, some by as many as three or four employees. Exhibit 11 at 9/17/13, 1/14/14, and 10/28/14.

Second, the Court notes that many tasks took longer than reasonably required. For example, it took Attorney Harman and another employee more than 9 hours to discuss, draft, and review changes to the original complaint, which consisted of the addition of seven sentences regarding the phone call, the addition of four sentences to deal with jurisdictional issues raised by the Court at the initial pretrial conference, and other non-substantive, minor edits in the introductory paragraphs of the complaint. Exhibit 11 at 7/25/13, 7/29/13, 7/31/13, and 8/1/13. It also appears to have taken three staff members approximately 2.5 hours to get a court hearing re-

scheduled, which should have been a routine task requiring minimal time and effort. Exhibit 11 at 5/21/14, 5/27/14, 5/29/14, and 6/4/14.

Third, the Court notes that the billing records may reflect some duplicate entries. For example, on October 1, 2013, there are two entries each for .2 hours of time by the same timekeeper with the entries described as "Office conference with MB re: extending deadlines" and "Office conference with MB re: extension of deadlines." On April 17, 2014, there are two entries one for 1.2 hours and one for .7 hours, both by the same timekeeper with the exact same description of "Prepare outline for hearing on motion for partial summary judgment." On May 20, 2014, there are two entries each for .1 hours of time by Attorney Harman with the entries described identically as "Office conference with MB regarding trial schedule." On June 27, 2014, there are two entries each for .1 hours by the same timekeeper with the entries described as "Conference with TH regarding steps to be taken in Bankruptcy Court; file declarations" and "Telephone conference with TH regrding [sic] steps to be taken per Bankruptcy Court to file declarations."

In addition, some of the billing records clearly show that time was spent on issues unrelated to Count VI of the complaint. On July 17, 2013, an entry for 2.8 hours reflects time was spent researching "tax consequences of bankruptcy discharge." On April 16, 2014, additional time was spent "regarding tax ramifications to discharge." That same day another entry for 4.6 hours includes time on "legal research re: whether filing 1099-A form violates discharge injunction." On May 6, 2014, time was spent discussing "potential Truth in Lending Act claim." On May 5, 2014, .8 hours was spent on "Legal research regarding appeal."

In the final analysis, the Court concludes that the case was overworked. The Debtors were unsuccessful on five of their six claims that the Defendants violated the discharge

injunction; they were only successful with respect to the June 2013 phone call.  However, the Debtors did not suffer any real damage as a result of Citi's phone call to them.  In a typical violation of discharge case, counsel would have sent the creditor a demand letter and, if unsuccessful, would have filed suit.  Given the nature of the violation, and the lack of damages, the parties would or should have settled the case.

Here, Citi did not seriously contest that it erred by making the automated phone call in June 2013.  The Debtors never actually tried the liability issue as they won that issue on summary judgment.  The time spent preparing and trying the damage issue under Count VI was not productive because the Debtors were unable to establish any actual damages.  See Duby v. United States (In re Duby), 2010 BNH 025, 3 (noting, in the violation of the automatic stay context, that courts "may consider a lack of actual damages when determining the reasonableness of attorneys' fees and costs"), aff'd in part and rev'd in part, Duby, 451 B.R. 664.

The Court finds that the amount of attorney's fees requested and the hours that were expended were unreasonable in this case and bore no relationship to the amount of money that was at issue (i.e., the cost of insurance on the Debtor's former residence that arguably Citi was requesting be procured) nor to any ascertainable emotional distress damages.  Attorney Harman and her firm could have properly represented the Debtors' interest while accruing far fewer than the 300+ billable hours claimed.  See Sullivan, 674 F.3d at 71.  In the Court's view, the Debtors' attorneys should have been able to resolve this matter in no more than 20 hours.  Thus, using the lodestar approach, the Court multiplies the number of hours productively spent, i.e., 20 hours, by a reasonable hourly rate, i.e., $305.00,[1] to obtain a total fee of $6,100.00.  See Duby, 451 B.R. at

---

[1] Attorney Harman testified that her rate was $295.00 per hour through July 31, 2014, and $325.00 thereafter.  Accordingly, her rate was $295.00 for approximately two-thirds of the case, i.e., from

15

668 (concluding the bankruptcy court's methodology in reducing fees to approximately sixteen percent of the amount requested by the debtor, from $74,039.00 for 448.2 hours of service to $11,848.50 for 79.9 hours of service, was sound and not an abuse of discretion); In re Bowling, 116 B.R. 659, 665 (Bankr. S.D. Ind. 1990) (awarding only $1,200.00 for attorney's fees, in a discharge violation case in which there were no actual damages, instead of the $5,000.00 requested as the requested amount was "excessive" and "out of proportion" to the $275.00 amount that was in dispute).

In addition to attorney's fees, the billing records show additional charges for expenses in the total amount of $502.57. Of that total, $110.30 was incurred prior to the phone call in June of 2013, $255.36 was incurred during their period when all six counts were pending, and $136.91 was incurred after the Court ruled in favor of the Debtors' with respect to liability under Count VI. The Court shall disallow the pre-phone call expenses, allow one-sixth of the expenses incurred when all six counts were pending,[2] and allow all expenses incurred during the damages phase. This results in allowable expenses of $179.47.[3]

**C. Sanctions**

At the close of trial, the Debtors requested that Citi be "sanctioned," apart from any award of emotional distress damages and attorney's fees and costs, because Citi "never

---

June 2013 through July 2014, and $325.00 for approximately one-third of the case, i.e.. from August 2014 through February 2015. The Court calculates that her average hourly rate for the case was $304.90 (($295.00 x .67) + ($325.00 x .33)), which the Court will round to $305.00. The Court recognizes that other employees in Attorney Harman's office had lower rates but the Court is calculating the amount of time that should have been spent on the case based on Attorney Harman's qualifications and level of experience.

[2] $255.36 ÷ 6 = $42.56

[3] $0 + $42.46 + $136.91 = $179.47

explained its conduct, never showed remorse, and never offered an apology." As explained earlier, bankruptcy courts may use their "statutory contempt power to order monetary relief, in the form of actual damages, attorney fees, and punitive damages, when creditors have engaged in conduct that violates § 524." Bessette, 230 F.3d at 445. Section 105 gives bankruptcy courts "broad authority to exercise its equitable power to ensure compliance with its own orders." Duby, 2010 BNH 025, 6 (citing Fatsis v. Braunstein (In re Fatsis), 405 B.R. 1, 7 (B.A.P. 1st Cir. 2009)). In the present case, Citi does not dispute that it caused an automated phone call to be made to the Debtors, more than two years after their home had been foreclosed, more than four years after the Debtors' bankruptcy discharge issued, and roughly a month after the Debtors had already filed suit against Citi for other alleged violations of the discharge injunction. Citi offered no explanation as to why the phone call was made. Obviously Citi's systems and procedures were inadequate or the phone call would not have made. The Court believes a small sanction of $2,500.00 is appropriate in the case. The Court hopes this award of punitive damages will act as a deterrent and motivate Citi to ensure that these types of violations do not occur in the future.

IV. CONCLUSION

Based on the foregoing the Court finds that the Debtors did not establish any entitlement to damages for out-of-pocket expenses or emotional distress pursuant to §105(a) on account of Citi's violation of the discharge injunction in § 524. The Court further finds that the Debtors are entitled to an award of attorney's fees in the amount of $6,100.00 and expenses of $179.47 as well as punitive damages in the amount of $2,500.00, for a total award of $8,779.47. This opinion constitutes the Court's findings of fact and conclusions of law in accordance with

Federal Rule of Bankruptcy Procedure 7052. The Court will issue a separate judgment consistent with this opinion.

  ENTERED at Manchester, New Hampshire.


Date: April 16, 2015        <u>/s/ J. Michael Deasy</u>
                 J. Michael Deasy
                 Bankruptcy Judge